# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED FOOD & COMMERCIAL WORKERS AND EMPLOYERS ARIZONA HEALTH AND WELFARE TRUST,** Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) | Civ. Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |
| Plaintiff | ) ) | |
| vs. | ) ) | |
| **ALLERGAN PLC; ACTAVIS, PLC; IMPAX LABORATORIES, INC.; LANNETT COMPANY, INC.; MYLAN PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL COMPANIES, INC.; WEST-WARD PHARMACEUTICALS CORP.** | ) ) ) ) ) ) ) ) | |
| Defendants | ) ) | |

## TABLE OF CONTENTS

Page

I.      NATURE OF ACTION ............................................................................1

II.     JURISDICTION AND VENUE................................................................6

III.    PARTIES .................................................................................................8

        A.      Plaintiff   ........................................................................................8

        B.      Defendants ....................................................................................8

IV.     AGENTS AND CO-CONSPIRATORS ...................................................11

V.      FACTUAL ALLEGATIONS....................................................................12

        A.      The Generic Drug Industry: A Cornerstone of the American
                Healthcare System ........................................................................12

        B.      Generic Doxycycline: Background.................................................16

        C.      Generic Digoxin: Background .......................................................20

        D.      Government Investigation Into The Generic Doxycycline and
                Generic Digoxin Markets...............................................................28

        E.      Defendants' SEC Filings Reveal Investigations Into Potential Antitrust
                Violations With Respect to Generic Drug Prices. ............................31

        F.      The Market For Generic Drugs Such As Doxycycline and Digoxin is
                Highly Conducive To Price Fixing And Collusion............................40

                1.      High Barriers to Entry: New Competitors Seeking to Enter the
                        Generic Drug Industry Face High Barriers to Entry ...............41

                2.      Inelastic Demand: The Highly Inelastic Demand for Generic
                        Drugs Facilitates Collusion....................................................43

                3.      Industry Concentration: The Highly Concentrated Aspect of
                        the Generic Doxycycline and Generic Digoxin Industries Increases
                        Its Susceptibility to Collusion and Other Anti-Competitive
                        Practices   44

                4.      Homogeneity: Generic Doxycycline and Generic Digoxin Are
                        Homogenous and Commoditized Products, Two Characteristics
                        That Are Highly Conducive for Collusion...............................46

                5.      Opportunity to Conspire: Defendants Have Ample Opportunities to
                        Conspire to Fix Prices of Generic Drugs Such As Doxycycline and
                        Digoxin Through Their Participation in Trade Associations.................48

i

　　　6.　　Lack of Buying Power: With No Comparable Substitutes Available, Indirect Purchasers of Generic Doxycycline and Generic Digoxin Are Forced To Purchase from Defendants In Order To Obtain the Medication ............................................................50

**VI.　DEFENDANTS' ANTITRUST VIOLATIONS CAUSED INJURY OF THE TYPE THAT ANTITRUST LAWS ARE MEANT TO PUNISH AND PREVENT** ...................................................................................................**51**

**VII.　CLASS ACTION ALLEGATIONS** ........................................................**53**

**VIII.　VIOLATIONS ALLEGED** ..................................................................**57**

**FIRST CLAIM FOR RELIEF**
(Violations of Sherman Act, 15 U.S.C. §§ 1 and 3)
(On Behalf of Plaintiff and the Nationwide Class Against All Defendants) ..............................**57**

**SECOND CLAIM FOR RELIEF**
(Violation of State Antitrust Statutes)
(On Behalf of Plaintiff and the Damages Class Against All Defendants) ..................................**58**

**THIRD CLAIM FOR RELIEF**
(Violations of State Consumer Protection Statutes)
(On Behalf of Plaintiff and the Damages Class Against All Defendants) ..................................**77**

**FOURTH CLAIM FOR RELIEF**
(Unjust Enrichment)
(On Behalf of Plaintiff and the Damages Class Against All Defendants) ..................................**94**

**IX.　REQUEST FOR RELIEF** ....................................................................**95**

**JURY DEMAND** ......................................................................................**97**

The United Food & Commercial Workers and Employers Arizona Health and Welfare Trust ("Plaintiff") brings this action on behalf of itself and all others similarly situated (the "Indirect Purchaser Classes" defined below, collectively "Plaintiffs") against Defendants Allergan plc ("Allergan"), Actavis, plc, ("Actavis"), Impax Laboratories, Inc. ("Impax"), Lannett Company, Inc. ("Lannett"), Mylan Pharmaceuticals, Inc. ("Mylan"), Par Pharmaceutical Companies, Inc. ("Par"), and West-Ward Pharmaceuticals Corp. ("West-Ward") (collectively, "Defendants") for conspiring to unlawfully raise the prices of generic doxycycline and generic digoxin to supracompetitive levels—thereby injuring Plaintiff and members of the Indirect Purchaser Classes.

Plaintiff's allegations in this Complaint are based upon personal knowledge as to the facts pertaining to the purchase of generic doxycycline and generic digoxin, and upon information and belief as to all other matters. These allegations are also based on the investigation of counsel. Plaintiff seeks damages, injunctive relief, and all other relief available under federal antitrust laws, state antitrust laws, and state consumer protection laws.

Plaintiff demands a trial by jury, and alleges as follows:

## I.     NATURE OF ACTION

1.      Generic drugs are a critical staple of America's healthcare system. For decades, generics have provided substantially lower-cost alternatives to brand-name medicines treating common ailments that would otherwise be cost-prohibitive for many – if not most – Americans. Because the United States does not regulate drug pricing or negotiate prices nationally like other countries, generic medicines have long been a safety valve for American patients, allowing them to obtain needed medicines at lower costs.[1]

---

[1] *See* The New York Times' "Lawmakers Look for Ways to Provide Relief for Rising Cost of Generic Drugs" by Elisabeth Rosenthal (November 24, 2014) at http://www.nytimes.com/2014/11/25/us/lawmakers-look-for-ways-to-

2.      Put simply, brand-name medication is granted patent protection for a number of years after they enter the market. Then, historically, after the patent expires, generic copies enter the fray and bring prices down – usually quite sharply.[2]



Image 1: Generic drugs offer consumers a lower-cost alternative with equal effectiveness as their branded medication. Source: http://basics.ibx.com/how-can-i-save-on-prescription-drugs/

3.      In recent years, however, the pricing of many common generic drugs such as generic doxycycline and generic digoxin have dramatically skyrocketed to unprecedented levels, leaving many Americans without access to decades-old, life-saving medication. The cost of many generic medications has increased so much during the Class Period that prices for many common generic drugs in the United States have surpassed those of their brand-name equivalents in other countries.[3]

---

provide-relief-for-rising-cost-of-generic-drugs.html?_r=0). Last accessed May 2, 2016.

[2] *See* The New York Times' "Lawmakers Look for Ways to Provide Relief for Rising Cost of Generic Drugs" by Elisabeth Rosenthal (November 24, 2014) at http://www.nytimes.com/2014/11/25/us/lawmakers-look-for-ways-to-provide-relief-for-rising-cost-of-generic-drugs.html?_r=0. Last accessed May 2, 2016.

[3] For example, a 90-day supply of the generic heart medicine digoxin sells for $187 in New York; the branded version, Lanoxin®, sells for $24.30 in Canada. *See* The New York Times' "Lawmakers Look for Ways to Provide Relief for Rising Cost of Generic Drugs" by Elisabeth Rosenthal (November 24, 2014) at http://www.nytimes.com/2014/11/25/us/lawmakers-look-for-ways-to-provide-relief-for-rising-cost-of-generic-drugs.html?_r=0. Last accessed May 2, 2016.

4.    This sharp explosion in pricing, however, was not caused by normal market forces. Rather, some of the world's largest pharmaceutical drug manufacturers, along with other key players in the market, have conspired to unlawfully maintain supracompetitive prices for certain generics such as doxycycline and digoxin by exchanging price information and engaging in pricing discussions and understandings in the generics market. In doing so, these pharmaceutical giants have reaped billions in revenue a year – with devastating human consequences.

5.    By participating in the price-fixing of the generic doxycycline and generic digoxin markets, Defendants, as defined herein, have jeopardized and are continuing to jeopardize the health of millions of Americans who needlessly struggle because a simple, common cure for their ailments is now financially out of reach due to Defendants' unlawful activity.

6.    For example, evidence shows that generic doxycycline had an average market price of $20 in October 2013.[4] 6 months later, in April 2014, the same bottle would cost a consumer a whopping $1,849 per bottle – a staggering 8,281% increase in price.[5]

7.    Similarly, a single tablet of generic digoxin in October 2012 had an average market price of $0.11 per pill.[6] By June 2014, the average price per pill was $1.10 – an 884% increase in price.[7]

---

[4] A bottle of 500, 100 mg tablets of doxycycline hyclate. *See* Ranking Member Cummings and Chairman Sanders Investigate Staggering Price Increases for Generic Drugs at http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file. Last accessed April 25, 2016.

[5] *Id.*

[6] Per single, 250 mcg tablet of digoxin. *See* Ranking Member Cummings and Chairman Sanders Investigate Staggering Price Increases for Generic Drugs at http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file. Last accessed April 25, 2016.

[7] *Id.*

| Drug | Use | Average Market Price Oct. 2013 | Average Market Price April 2014 | Average Percentage Increase |
|------|-----|-------------------------------|--------------------------------|----------------------------|
| Doxycycline Hyclate (bottle of 500, 100 mg tablets) | antibiotic used to treat a variety of infections | $20 | $1,849 | 8,281% |

| Drug | Use | Average Market Price Oct. 2012 | Average Market Price June 2014 | Average Percentage Increase |
|------|-----|-------------------------------|--------------------------------|----------------------------|
| Digoxin (single tablet, 250 mcg) | used to treat irregular heartbeats and heart failure | $0.11 | $1.10 | 884% |

Image 2: Chart showing staggering increase in generic doxycycline and generic digoxin in a period of less than 1 year.

8.      These striking price increases have prompted extensive scrutiny by the United States Congress and by federal and state antitrust regulators, who have opened governmental investigations into several manufacturer companies. Defendants Allergan, Actavis, Lannett, Par, Impax, and Mylan have all received subpoenas from the United States Department of Justice ("DOJ").[8]

9.      Congress also launched an investigation into generic drug pricing, with a focus on generic doxycycline and generic digoxin. All Defendants named in this Complaint also received a letter from Senator Bernard Sanders ("Sanders") and Congressman Elijah E. Cummings ("Cummings") in October 2014 ("October 2014 Letters") seeking further information into the corporations' generic doxycycline and/or generic digoxin pricing.[9]

---

[8] It is currently unknown whether Defendant West-Ward also received a subpoena because West-Ward's foreign parent (Hikma Pharmaceuticals PLC) does not make disclosures to the U.S. Securities and Exchange Commission ("SEC").

[9] These October 2014 letters can be found at: http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing. Last accessed April 29, 2016.

**Congress of the United States**
**Washington, DC 20515**

October 2, 2014

Image 3: Letters to Defendants regarding further information on the companies' generic doxycycline and/or generic digoxin pricing can be found here: http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

10.     A subsequent hearing on November 20, 2014 was held by Sanders' committee entitled "Why Are Some Generic Drugs Skyrocketing In Price?" ("November 2014 Senate Hearing").[10] As Sanders declared: "It is unacceptable that Americans pay, by far, the highest prices in the world for prescription drugs. Generic drugs were meant to help make medications affordable for the millions of Americans who rely on prescriptions to manage their health needs, and now some of them are becoming unaffordable."

11.     In summary, the pharmaceutical generic drug industry is high-volume, low-margin, steady, and profitable, grossing over $74.2 billion in worldwide sales in 2014.[11] Defendants—some of the worlds' largest manufacturers of generic doxycycline and generic digoxin — along with other co-conspirators (as yet unknown) agreed, combined, and conspired to inflate, fix, raise, maintain or artificially stabilize the prices of generic doxycycline and generic digoxin sold in the United States.[12]

---

[10] *See* the Pharmacy Times' "Senate Hearing Investigates Generic Drug Prices" by Eileen Oldfield (December 11, 2014) at http://www.pharmacytimes.com/publications/issue/2014/december2014/senate-hearing-investigates-generic-drug-prices: "The hearing took place as part of the Senate subcommittee on Primary Health and Aging, which is part of the Senate Committee on Health, Education, Labor, and Pensions. 'We've got to get to the bottom of these enormous price increases,' Sen. Sanders said." Last accessed May 2, 2016.

[11] The top 20 generics producers, owning the lion's share of the market, also collected the bulk of the profit at $61.7 billion (83.1% of the take). *See* FiercePharma's "Top 20 generics companies by 2014 revenue" by Eric Palmer at http://www.fiercepharma.com/special-report/top-20-generics-companies-by-2014-revenue. Last accessed on April 25, 2016.

[12] "Defendants," refers collectively to the following entities: Allergan plc, Actavis, Impax Laboratories, Inc.



Image 4: As Sanders' said: "Drug companies have seen the opportunity to make a whole lot of money and they are seizing that opportunity. This is greed at work in the pharmaceutical industry."
Source: http://www.sanders.senate.gov/newsroom/recent-business/senate-hearing-on-generic-drug-prices

12.     Defendants' conduct violated, and continues to violate, Sections One and Three of the Sherman Act; State Antitrust Statutes; and State Consumer Protection Statutes. Plaintiff and the Class paid artificially inflated prices for generic doxycycline and generic digoxin as a result of Defendants' conspiracy, and have thereby suffered antitrust injury to their business or property as a direct result of the anticompetitive and unlawful conduct alleged herein.

## II.    JURISDICTION AND VENUE

13.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for injuries sustained by Plaintiff and the members of the Class by reasons of the violations of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3). This action is also brought under the

("Impax"), Lannett Company, Inc. ("Lannett"), Mylan Pharmaceuticals, Inc. ("Mylan"), Par Pharmaceutical Companies, Inc. ("Par"), and West-Ward Pharmaceuticals Corp. ("West-Ward").

antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in Counts Two, Three, and Four below.

14.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367.

15.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period, as defined herein, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore, it is likely that acts in furtherance of the alleged conspiracy took place here – where Defendants Lannett and Mylan are headquartered, and where Defendant Impax's generics division (Global Pharmaceuticals) is located.

16.     This Court has in personam jurisdiction over each of the Defendants because, *inter alia*, each Defendant: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of generic doxycycline and/or generic digoxin throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this

District, and they have purposefully availed themselves of the laws of the United States. Their anticompetitive conduct, and its effect on United States commerce described herein, caused antitrust injury to Plaintiffs and members of the Classes in the United States.

## III.   PARTIES

### A.   Plaintiff

17.   The United Food & Commercial Workers and Employers Arizona Health and Welfare Trust ("Plaintiff") indirectly purchased, paid, and/or provided reimbursement for generic digoxin and doxycycline products made by one or more Defendants at supracompetitive prices in multiple states across the United States during the Class Period. As a result of the alleged conspiracy, Plaintiff was injured in its business or property by reason of the violations of law alleged herein. Plaintiff has its principal place of business in Phoenix, Arizona. Plaintiff has been injured and is threatened with further injury as a result of the violations alleged in this Complaint.

### B.   Defendants

18.   Defendant Allergan plc is an Irish pharmaceutical corporation centered on developing, manufacturing, and commercializing generic medicines, pharmaceuticals, over-the-counter ("OTC") medicines, and biologic products. Globally headquartered in Dublin, Ireland and administratively headquartered in Parsippany-Troy Hills, New Jersey, Allergan remains the third-largest generic drug manufacturer in the United States, and operates over 40 manufacturing and distribution facilities around the world with a capacity of producing approximately 40 billion units annually. Outside of the United States, (operating as "Allergan") its generics business holds a top 5 leadership position in nearly 20 international markets. To these ends, Allergan touts itself as a "Leading Global Generics Business," recognized for its portfolio of over 1,000+ generics,

established brands, and OTC products, including doxycycline and digoxin. During the Class Period, Allergan sold generic doxycycline and generic digoxin to customers in this district and in other locations in the United States.

19.     Defendant Actavis plc is a pharmaceutical corporation with its global headquarters in Dublin, Ireland, and with administrative headquarters in New Jersey.   In November of 2014, Actavis announced its intention to acquire Allergan.   On March 17, 2015, Actavis completed its acquisition of Allergan for $70.5 billion.   In June 2014, Actavis plc officially changed its name to Allergan, but the company's U.S. and Canadian generics business continue to operate under the Actavis name.   During the Class Period, Actavis sold generic doxycycline and generic digoxin to customers in this district and in other locations in the United States.

20.     Defendant Impax Laboratories ("Impax") is a leading technology-based specialty pharmaceutical company. Corporately headquartered in Hayward, California, Impax also owns manufacturing and distribution facilities in New Jersey, Pennsylvania, and Taiwan. Impax's Hayward, California commercial manufacturing operations facility can produce approximately 1.2 billion units of oral, solid dosage forms annually, and its Taiwan facility is scaled to produce 500 million tablets and capsules annually.  Impax's generics division, Global Pharmaceuticals, focuses on developing controlled-release and specialty generics, and currently manufactures and markets a portfolio of 96 generic pharmaceutical products, including doxycycline and digoxin. During the Class Period, Impax sold generic doxycycline and digoxin to customers in this District and other locations in the United States.

21.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation that has its principal place of business in Philadelphia, Pennsylvania.  Lannett develops, manufactures,

and distributes a broad spectrum of generic prescription pharmaceutical products in tablet, capsule, and oral liquid forms to customers throughout the United States. Founded in 1942, Lannett predominately markets its generic products to drug wholesalers, retail drug chains, distributors, and government agencies. During the Class Period, Lannett sold generic doxycycline and generic digoxin to customers in this District and other locations in the United States.

22. Defendant Mylan, Inc. ("Mylan") has been one of the world's leading generics and specialty pharmaceutical companies – with sales in approximately 165 countries and territories – for more than 50 years. During that time, Mylan has become the second-largest generic and specialty pharmaceuticals company in the world, with over 30,000 employees, over 1,400 separate products, and a global manufacturing output of more than 45 billion doses that garnered $7.72 billion in revenue in 2014. Registered in the Netherlands, Mylan also owns operation headquarters in Hatfield, Hertfordshire, United Kingdom and a United States operations base in Canonsburg, Pennsylvania. During the Class Period, Mylan sold generic doxycycline and generic digoxin to customers in this district and other locations in the United States.

23. Defendant Par Pharmaceutical Companies, Inc. ("Par"), headquartered in Chestnut Ridge, New York, develops, manufactures, and markets generic pharmaceutical products in the United States. Founded in 1987, Par is a pharmaceutical giant currently ranked as the fifth largest generic pharmaceutical company in the United States. During the Class Period, Par sold generic doxycycline and generic digoxin to customers in this district and other locations in the United States.

24.     Defendant West-Ward Pharmaceutical Corp. ("West-Ward") is one of the leading generic prescription medication providers in the United States, offering both oral solid and injectable pharmaceuticals to a growing number of chain stores, wholesalers, distributors, health systems, and government agencies. Established in 1946 as a generic orals manufacturing company, West-Ward is a wholly owned, U.S. subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), based in Amman, Jordan, and headquartered in London, England. West-Ward has had a longstanding presence in the United States oral solid generics market, and maintains a portfolio of over 90 pharmaceutical products, including generic medicines such as doxycycline and digoxin, spanning 45 countries across the United States, Europe, the Middle East, and North Africa.  Through its 27 manufacturing facilities worldwide, Hikma's 2014 revenue exceeded nearly $1.5 billion globally.  During the Class Period, West-Ward sold generic doxycycline and generic digoxin to customers in this district and other locations in the United States.

## IV.    AGENTS AND CO-CONSPIRATORS

25.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

26.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct. Plaintiffs reserve the right to name some or all of these persons and entities as Defendants at a later date.

27.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited

11

liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## V.     FACTUAL ALLEGATIONS

### A.     The Generic Drug Industry: A Cornerstone of the American Healthcare System

28.     Generic drugs are a cornerstone of modern-day prescription medicine; a critical option that allows life-saving access to essential health care for all Americans. Biochemically and therapeutically identical to their brand-name alternatives, generic drugs are comparable to their branded medicines in dosage form, strength, quality and performance characteristics, and intended use.[13] Indeed, generic medicines are "copies" of their brand-name equivalents – but at a substantially lower price point – making them a preferred substitute by prescribing physicians, dispensing pharmacists, and hospitals alike.

29.     Since generics are traditionally lower-cost alternatives to brand-name medicines, they are widely-prescribed and relied upon by American consumers. In a January 2012 report, the Government Accounting Office noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[14]

30.     The United States is the world's largest drug market, and according to a report by the IMS Institute for Healthcare Informatics, about 86% of all prescriptions filled in the U.S. are for generic drugs.[15]

---

[13] *See* the United States Food and Drug Administration's ("FDA") "Understanding Generic Drugs at http://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/UnderstandingGenericDrugs/. May 2, 2016.

[14] *See* United States Government Accountability Office letter of January 31, 2012 at page 1 at http://gao.gov/assets/590/588064.pdf. Last accessed on April 26, 2016.

[15] *See* The Wall Street Journal: *Justice Department Probes Generic Companies after Price Hike Reports* by Ed



Image 5: Nearly 8 out of 10 prescription drugs filled in the United States are for generic drugs versus the branded drug. Source: http://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/UnderstandingGenericDrugs/ucm167991.htm.

31.    In 2010 alone, this use of FDA-approved generics amounted to a savings of $158 billion as compared to its branded equivalent – an average of $4 billion every week. Since the passage of the Hatch-Waxman Act [Pub. L. No. 98-417, 98 stat. 1585 (codified at 15 U.S.C. §§ 68b-68c, 70b; 21 U.S.C. §§ 301 note, 355, 360cc; 28 U.S.C. § 2201; 35 U.S.C. §§ 156, 271, 282)], every state has adopted substitution laws that require or permit pharmacies to substitute generic drug equivalents for branded drug prescriptions.

32.    The significant cost-saving aspect of generics for Americans is undeniable: according to the Generic Pharmaceutical Association, in the 10-year period from the beginning of 2003 through 2012, generic drug use has generated more than $1.2 trillion in savings.[16]

---

Silverman (Nov. 10, 2014) at http://blogs.wsj.com/pharmalot/2014/11/10/justice-department-probes-generic-competition-after-price-hike-reports/. Last accessed April 25, 2016.

[16] *See* The New York Times: *Officials Question the Rising Costs of Generic Drugs* by Elisabeth Rosenthal (Oct. 7, 2014) at http://www.nytimes.com/2014/10/08/business/officials-question-the-rising-costs-of-generic-drugs.html?_r=0. Last accessed on April 25, 2016.



Image 6: Generic drug use has saved Americans over $1.2 trillion in savings.
Source: https://www.consumeraffairs.com/generic-drug-approvals-and-savings

33.     "Generic drugs were meant to help make medications affordable for the millions of Americans who rely on prescriptions to manage their health needs," Senator Sanders said in a statement. Therefore, "[w]e've got to get to the bottom of these enormous price increases. It is unacceptable that Americans pay, by far, the highest prices in the world for prescription drugs. Generic drugs were meant to help make medications affordable for the millions of Americans who rely on prescriptions to manage their health needs and now some of them are becoming unaffordable."[17]

34.     And these price rises have been astronomical. Regarding generic doxycycline and generic digoxin: as previously described, the price that hospitals and pharmacies pay for a bottle of 500 tablets of doxycycline, a decades-old antibiotic, rose to $1,849 in April 2014 from $20 in October 2013. The price of a pill of digoxin, a centuries-old medicine that is irreplaceable for some cardiac patients, rose to $1.10 in 2014 from 11 cents in 2012.

---

[17] *See* "Congressional Panel to Probe Generic Drug Price Hikes" (November 11, 2014) at http://www.sanders.senate.gov/newsroom/press-releases/congressional-panel-to-probe-generic-drug-price-hikes. Last accessed on April 29, 2016.



Image 7: Generic doxycycline rose 8,281% in 6 months from $20 per bottle of 500 tablets to $1,849 per bottle.
Source: Cotchett, Pitre, & McCarthy, LLP



Image 8: Generic digoxin rose 884% from $0.11 per tablet to $1.10 per tablet in less than two years.
Source: Cotchett, Pitre, & McCarthy, LLP

35.     However, generic drugs operate more than to simply save money: studies have repeatedly shown that low-cost generics can help improve medication adherence by making it easier for patients to access their medications. Medication adherence is critical for effective patient treatment. Non-adherence to medication is a widespread problem and generics serve in a way to control the issue.

**B.     Generic Doxycycline: Background**

36.     Doxycycline is a widely-prescribed oral antibiotic that has been on the market since 1967. Used to treat a variety of ailments from skin conditions and bacterial infections to cholera and acne, doxycycline is on the World Health Organization's ("WHO") List of Essential Medicines as one of the most critical medications needed in a basic health system.[18]

37.     According to the 2015 edition of the United States Food and Drug Administration's ("FDA") Orange Book, the Reference Listed Drug ("RLD") of doxycycline is Pfizer's Vibramycin®. An RLD is an approved drug product to which new generic versions are compared to show that they are bioequivalent.[19] In other words, the generic version performs in the same manner as the Reference Listed Drug, and a drug company seeking approval to market a generic equivalent must refer to the RLD in its Abbreviated New Drug Application ("ANDA"). Once the FDA determines that a drug company's application contains sufficient scientific evidence establishing the bioequivalence of the applied product to the RLD, an applicant may manufacture and market the drug as a generic – a low-cost alternative of the original branded medication – to consumers.

---

[18] *See* WHO Model List of Essential Medicines, amended August 2015 at
http://www.who.int/selection_medicines/committees/expert/20/EML_2015_FINAL_amended_AUG2015.pdf?ua=1.
Last accessed on May 2, 2016.

[19] *See* http://www.fda.gov/drugs/informationondrugs/ucm079436.htm#rld. Last accessed April 26, 2016.

38.     The FDA will generally also assign a Therapeutic Equivalence Code ("TE Code") of "AB" to products that it determines are bioequivalent.[20] This coding system allows users to quickly determine important information about the drug product in question. Generic doxycycline in capsule form almost universally has a TE Code of AB.[21]

39.     The pattern of astronomical price increases for generic doxycycline began in the fall of 2012, a year earlier than for generic digoxin. As part of a presentation to the November 2014 Senate Hearing, Dr. Stephen Schondelmeyer ("Dr. Schondelmeyer"), Director of the PRIME Institute at the college of Pharmacy for the University of Minnesota, submitted the following chart detailing the sudden increase in West-Ward's pricing for generic doxycycline. As the chart illustrates, the AWP ("Average Wholesale Price") shot from $2.50 per day of therapy for 100mg capsules of doxycycline hyclate in October 2012 to over $11 per day of therapy 3 months later in January 2013.

---

[20] *See* http://www.fda.gov/drugs/developmentapprovalprocess/formssubmissionrequirements/electronicsubmissions/datastandardsmanualmonographs/ucm071713.htm. Last accessed on April 26, 2016.

[21] *See* FDA's Orange Book at http://www.accessdata.fda.gov/scripts/cder/ob/docs/obdetail.cfm?Appl_No=050795&TABLE1=OB_Rx. Last accessed April 29, 2016.



Image 8: Chart demonstrating the sharp rise in price of generic doxycycline hyclate (100 mg).
Source: http://www.help.senate.gov/imo/media/doc/Schondelmeyer.pdf.

40.     Total retail sales of generic doxycycline in the United States in 2013 were estimated to be over $973 million, and the primary actors in the generic doxycycline market are Defendants Allergan, Actavis, Lannett, Mylan, Par, and West-Ward, who collectively control a commanding share of the market.

41.     There were no reasonable justifications for these sudden, dramatic shifts in pricing of generic doxycycline. For example, there was no shortage of doxycycline during the relevant time periods. The FDA announced a shortage of doxycycline in January 2013, but the

drug was placed on the resolved shortage list by October 2013.[22] At any rate, this timeframe during which the shortage occurred followed the increase in pricing.

42.     To this day, generic doxycycline prices remain inflated, causing extreme hardship to patients, hospitals, pharmacies, and insurers alike. As reported by NBC-Nashville in March 2013:

> Many people may not recognize the name, but they have probably used it for a health problem at one point. Doctors use doxycycline to treat a wide range of issues, including everything from acne to Lyme disease, anthrax exposure and even heartworm in our pets.

> However, the once cheap and effective drug has now dramatically gone up in price, and that has health professionals concerned. Hospitals like Vanderbilt University Medical Center keep doxycycline in stock, but some folks worry the cure for their ailment could now be financially out of reach.

> "It's a change that occurred overnight," said Vanderbilt pharmacy manager Michael O'Neil. Not long ago, the pharmacy at Vanderbilt's hospital could purchase a 50-count bottle of 100 mg doxycycline tablets for $10, but now the same bottle costs a staggering $250. "That's concerning to us, both as citizens and practitioners, when you see a huge increase like this in a price of a drug," O'Neil said.

> Vanderbilt keeps thousands of doxycycline pills on hand in the event of a bioterrorist attack, like anthrax, and O'Neil said replacing expired pills is prohibitive. "This one is just hurting us when we need to replace the medication," he said.

> But it's the most vulnerable who are in the most jeopardy. For a pet, a heartworm diagnosis can be a death sentence without doxycycline. Veterinarian Dr. Joshua Vaughn of the Columbia Hospital for Animals is already seeing the tragic results. "We had one patient who we diagnosed with heartworm. We recommended heartworm treatment, but when they saw the total dollar amount, they elected not to treat the dog at all," Vaughn said.

> Vaughn said he wrote a recent prescription for doxycycline that cost $77. This week, the price increased to nearly $3,000. (emphasis added).[23]

---

[22] See the Centers for Disease control and Prevention ("CDC") Drug Notices' webpage at http://www.cdc.gov/std/treatment/drugnotices/doxycyclineshortage.htm: The U.S. Food and Drug Administration placed doxycycline on the resolved drug shortage list as of October 23, 2013. Last accessed on May 2, 2016.

[23] See NBC-Nashville's "Sudden increase in cost of common drug concerns many" from March 12, 2013 at http://www.wsmv.com/story/21616095/sudden-increase-in-cost-of-common-drug-concerns-many. Last accessed on



Image 9: Doxycycline is a simple, 30-day regimen for dogs suffering from heartworm. But with the astounding increase in price for the antibiotic, families are forced to forego standard treatment for their pets.
Source: http://dogsaholic.com/care/heart-worm-medicine-for-dogs.html

### C.    Generic Digoxin: Background

43.    Digoxin is used to treat mild to moderate heart failure in adults, increase heart contracting functions for pediatric patients with heart failure, and control the resting heart rate in adult patients with chronic atrial fibrillation.

44.    A mainstay of treating older patients with rapid heart rhythm disturbances, digoxin was first described in the medical literature in 1785. Millions of Americans still use the drug every day for heart conditions such as heart failure and irregular heartbeat – many of whom had long paid merely pennies per pill.

45.    Digoxin comes as a tablet, capsule, or pediatric elixir (liquid) for oral consumption.

April 27, 2016.



Image 10: Stock photo of Defendant Lannett's generic digoxin, a decades-old heart medication.
Source: http://www.newsinferno.com/.

46.     The branded version of generic digoxin is Lanoxin®. In December 2011, GlaxoSmithKline plc sold its commercial rights in Lanoxin to Covis Pharmaceuticals Inc. ("Covis"). Currently, Lanoxin® is manufactured by DSM Pharmaceuticals, Inc., and is distributed by Covis. In January 2014, Defendant Par contracted with Covis for exclusive distribution rights for an authorized generic version of Covis' Lanoxin® tablets in the United States – generic digoxin.

47.     According to its August 27, 2015 Form 10-K ("August 2015 10-K") filed with the SEC, Defendant Lannett has been involved in the business of generic digoxin distribution since at least March 2004.[24] At that time, Lannett entered into a supply agreement with Jerome Stevens Pharmaceuticals ("JSP") for the exclusive distribution rights in the United States to generic digoxin and two other drugs manufactured by JSP. As reflected in Lannett's August 2015 10-K,

---

[24] *See* SEC Form 10-K filed by Lannett at
http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm. "In 2004, we entered into an exclusive ten-year distribution agreement (the "JSP Distribution Agreement") with Jerome Stevens Pharmaceuticals ("JSP") covering four different product lines." Last accessed April 29, 2016.

this agreement was made in exchange for 4 million shares of Lannett's common stock. Thereafter, Lannett and JSP amended the original agreement to extend the initial contract for five more years until March 2019. Lannett's August 2015 10-K shows that for additional consideration, Lannett issued to JSP 1.5 million shares of Lannett common stock, valued at approximately $20.1 million.

48.   Defendant Lannett markets and distributes two potencies of generic digoxin – the 0.125 mg tablet and the 0.250 mg tablet. Both dosages have a TE Code of AB and therefore, are generic equivalents to the corresponding respective strengths of its brand-named medication Lanoxin®.

49.   As reflected in their SEC Form 10-Ks from 2007 through 2014, Defendant Lannett's sales of generic digoxin totaled $12.4 million in 2011; $10.9 million in 2012, $11.7 million in 2013; and $54.7 million in 2014. These numbers reflect a $43 million increase in profit from 2013 to 2014.

Table 1: Defendant Lannett's Sales of Generic Digoxin

| 2011 | $12.4 million |
|------|---------------|
| 2012 | $10.9 million |
| 2013 | $11.7 million |
| 2014 | $54.7 million |

50.   By October 2013, the generic digoxin market was essentially a duopoly controlled by Defendants Lannett and Impax. Defendant West-Ward was also a competitor, but was required to suspend operations in November 2012 in the wake of an investigation by the FDA

into production problems at its manufacturing facility. After spending $39 million in remediation efforts, it resumed participation in the generic digoxin market in July 2013.[25]

51.     Similar to generic doxycycline, there was no reasonable explanation for this sudden exponential increase in price for generic digoxin. Indeed, generic digoxin pricing was remarkably stable until approximately mid-October 2013. That stability is reflected in the below chart created by Dr. Stephen Schondelmeyer ("Dr. Schondelmeyer"), Director of the PRIME Institute at the college of Pharmacy for the University of Minnesota, as part of his testimony at a November 20, 2014 Senate Committee hearing.[26]



Digoxin 0.25 mg Tablet (Lannett) Price per Day of Therapy:
(January 1, 2005 to December 31, 2013)

---

[25] *See* Health Outcomes Strategies "HIKMA filling the gaps when bigger operators have plant problems and drug shortages arise" by Eric Palmer (March 13, 2014) at http://www.health-os.com/?p=324. Last accessed May 2, 2016.

[26] In the chart, "AWP" and "WAC" refer to "Average Wholesale Price" and "Wholesale Acquisition Price," respectively. Both are used as benchmark prices by Dr. Schondelmeyer. *See* Dr. Stephen W. Schondelmeyer's Statement before Senate committee on Health, Education, Labor and Pensions, Congress of the United States (November 20, 2014) at Figure 12. Available at http://www.help.senate.gov/imo/media/doc/Schondelmeyer.pdf. Last accessed on April 27, 2016.

Image 11: Chart demonstrating the sharp rise in price of generic digoxin (0.25mg tablet).
Source: http://www.help.senate.gov/imo/media/doc/Schondelmeyer.pdf.

52.     This sudden departure from low and stable prices that appeared in October 2013 –
which alone is indicative of collusion – were caused by abrupt pricing changes made by
Defendants Impax, Lannett, and West-Ward, which were followed by Defendants Mylan and Par
when it entered the market in 2014 and 2015, respectively.

53.     Around the end of 2013, .125mg and .250 mg tablets of digoxin prices increased
over 750%, from $.11 and $.12 cents per tablet to $.91 and $1.01 per tablet, respectively.
Between December 2013 and January 2014, the prices of generic digoxin spiked again – to $1.08
and $1.11 per tablet. In other words, daily heart medication, relied upon by millions of
Americans, that once cost 11 or 12 cents per pill in November 2013 cost nearly 10 times more
two months later in January 2014.



Image 12: Left: Roughly what American consumers could purchase with $1 in November 2013
(10 digoxin pills). Right: Roughly what the same dollar translated to just two months later in
January 2014.
Source: Cotchett, Pitre & McCarthy, LLP

24

54.     There were no reasonable justifications for these astounding shifts in pricing of generic digoxin. For example, there was no supply disruption reported by Defendants with respect to digoxin in fall 2013. Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons for the shortage, and the expected duration of the shortage. But as reported by the Generics and Biosimilars Initiative, "[a]t the time of the price increases, the US Food and Drug Administration had reported no drug shortages, there was no new patent or new formulation and digoxin is not difficult to make. The companies have not yet provided an explanation for the price rise. Not surprisingly… patients have begun to question whether they can afford the drugs that have kept them healthy for many years."

55.     The number of competitors in the market also does not explain the sudden soar in generic digoxin pricing. The chart submitted by Dr. Schondelmeyer before the Senate Hearing shows that from October 2012 to November 2013, the National Average Drug Acquisition Cost ("NADAC") remained consistent at $0.11 for the 0.125 mg tablets and between $0.11 to $0.12 for the 0.250 mg tablets.

56.     These prices remained so even during the period of time when Defendant West-Ward suspended its production, leaving Impax and Lannett the only two significant players in the market. In July 2013, West-Ward returned, but pricing still remained steady for several months. Following the sudden price spike in fall 2013, Defendants Par and Mylan both entered the market in 2014 and 2015, respectively – yet prices did not fall despite the addition of new competitors, as would be expected.

57.     To this day, pricing for generic digoxin remains inflated, causing catastrophic consequences on patients who rely daily on the decades-old, common medication. Pharmacist

Robert Frankil ("Dr. Frankil") illustrated the hardship caused by the digoxin price increases with the following at the Senate Hearing:

> "A recent example from my own experience is the price of Digoxin – a drug used to treat heart failure. The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply. That's an increase of 800%. One of my patients had to pay for this drug when he was in the Medicare Part D coverage gap in 2014. Last year, when in the coverage gap he paid the old price. This year he paid the new price. Needless to say, the patient was astounded, and thought I was overcharging him. The patient called all around to try to get the medicine at the old, lower price, but to no avail. This caused him lots of stress and time, and caused us lots of stress and time in explaining the situation, reversing, and rebilling the claim. This example is typical of how these price spikes put consumers and pharmacists in a bad position, often grasping at straws for explanations. And all the while, everyone pays more, including the patient, the pharmacy, and the insurer (often the federal government)."



Image 13: Americans were hit with a nearly 10-fold increase in average market price for generic digoxin.
Source: Cotchett, Pitre & McCarthy, LLP

58.     On the other hand, Defendants like Lannett, the major supplier of digoxin in the United States, have benefited enormously. Lannett's reported sales for cardiovascular products – and the major drug in that category is digoxin – rose from $4.5 million to $16.9 million in just a few months, according to company conference calls with investors. In a February 2014 call, Arthur Bedrosian ("Bedrosian"), the chief executive, said Lannett's net sales had increased 84% annually, and were the best in the company's history.



Image 14: The top company on Forbes' 2015 Fastest Growing Companies list was Defendant Lannett, whose "outstanding growth is a credit to a confluence of factors: rising health care spending, an aging population, and growing prices for generic drugs" (emphasis added). Source: http://fortune.com/2015/08/19/lannett-fastest-growing-company/

59.     Meanwhile, Antoinette Newell (below), 85, said she was shocked when her co-pay for digoxin – one of the oldest known heart medications – suddenly jumped in 2014 to $30 per month from $1.15 for a three-month supply. A widow from Schenectady, New York, Ms.

Newell said about her digoxin refill: "I was so upset, I at first told the pharmacist I didn't want it. But I know I need it. It's the only pill that works for me." (emphasis added).[27]



Image 15: Ms. Newell and her physician, Dr. Barry Lindenberg, have seen a sudden rise in the cost of digoxin for her heart. Source: http://www.nytimes.com/2014/07/09/health/some-generic-drug-prices-are-soaring.html?_r=0

### D.    Government Investigation Into The Generic Doxycycline and Generic Digoxin Markets.

60.    As a result of the unseemly profits made by generic drug manufacturers as established above in this Complaint, the Antitrust Division of the United States Department of

---

[27] Ms. Newell is not the only patient in this position. Dr. Lindenberg heard from many patients requesting a drug change because they could no longer afford digoxin. He noted that one patient did not fill her prescription because it would have cost her $1.60 per pill, and that she ended up in intensive care as a result. *See* The New York Times' "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise" by Elisabeth Rosenthal (July 8, 2014) at http://www.nytimes.com/2014/07/09/health/some-generic-drug-prices-are-soaring.html?_r=0. Last accessed on April 27, 2016.

Justice ("DOJ") commenced in the Fall of 2014 a wide-ranging criminal investigation of this broad conspiracy of generic drugs and has caused grand jury subpoenas to be issued to various Defendants in connection with this investigation.

61.    The investigation encompasses generic drugs other than digoxin and doxycycline and, as the scope of the DOJ's investigation becomes further clarified, Plaintiff reserves the right to amend its complaint to include additional parties and/or claims.

62.    As previously mentioned, Defendants' dramatic and unexplained price increases on generic drugs have prompted intense scrutiny by the United States Congress, as well as by federal and state antitrust regulators. In a January 8, 2014 letter to members of key committees of the United States House of Representatives and Senate from Douglas P. Hoey, Chief Executive Officer of the National Community Pharmacists' Association, asked Congress to conduct an investigation into generic drug price increases.[28]

63.    On October 2, 2014, Senator Bernard Sanders ("Sanders") and Congressman Elijah E. Cummings ("Cummings") sent letters to all Defendants named in this Complaint ("October 2014 Letters") seeking further information into the corporations' generic doxycycline and/or generic digoxin pricing.[29] "We launched this investigation because prices for generic drugs are skyrocketing, preventing many Americans from purchasing the critical medications they need," Cummings said. "I applaud the Department of Justice for also looking into the root

---

[28] *See* National Community Pharmacists Association letter at https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf, which begins with: "Over the last six months I have heard from so many of our members across the U.S. who have seen huge upswings in generic drugs that are hurting patients and pharmacies ability to operate… ***We respectfully request that you… examine what factors may have led to these unmanageable spikes in generic drugs***…".

[29] These October 2014 letters can be found at: http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing. Last accessed April 29, 2016.

causes of these huge increases, so that every American has access to the medications they need."[30]

64.     On November 20, 2014, Sanders' committee held a hearing ("November 2014 Senate Hearing") entitled "Why Are Some Generic Drugs Skyrocketing In Price?" during which numerous witnesses discussed the price hikes for generic drugs. Although Arthur Bedrosian ("Bedrosian"), the CEO of Defendant Lannett, was invited to testify, neither he nor any other chief executive of a generic drug manufacturer did so.[31]

65.     Antitrust regulators have also been actively investigating the price hikes. In August 2014, the Connecticut Attorney General ("Connecticut AG") opened an antitrust investigation into digoxin pricing. Defendants Lannett, Impax, and Par were subpoenaed concerning a conspiracy to restrain trade by 1) fixing, maintaining, or controlling the price of digoxin or 2) allocating and dividing customers or territories relating to digoxin.

66.     By November 3, 2014, likely prompted by the investigation by the Connecticut AG[32], the DOJ opened a criminal grand jury investigation into the pricing of various generic drugs, including generic doxycycline and generic digoxin. To date, the grand jury has issued subpoenas to Defendants Lannett and Lannett's Vice President of Sales and Marketing; Impax and an unidentified sales presentative of Impax; Allergan; Actavis; Mylan; and Par.

---

[30] *See* "Congressional Panel to Probe Generic Drug Price Hikes" (November 11, 2014) at http://www.sanders.senate.gov/newsroom/press-releases/congressional-panel-to-probe-generic-drug-price-hikes. Last accessed on April 29, 2016.

[31] *See* "Drugmakers Mum on Huge Price Hikes" (November 20, 2014) at http://www.sanders.senate.gov/newsroom/press-releases/drugmakers-mum-on-huge-price-hikes. Last accessed April 29, 2016.

[32] *See* Law360's "DOJ Investigation Into Generic Pharma: You Could Be Next" from March 30, 2015 at http://www.law360.com/articles/636644/doj-investigation-into-generic-pharma-you-could-be-next: "There could very well be a direct connection between Connecticut's investigation and the DOJ's investigation." Last accessed May 2, 2016.

67.     On February 24, 2015, Sanders and Cummings also followed up on the Senate Hearing by writing a letter to the Office of the Inspector General ("OIG") of the Department of Health and Human Services asking it to investigate the effect that the alarming price increases of generic drugs, including generic digoxin, have had on generic drug spending within the Medicare and Medicaid programs.[33] On April 12, 2015, the OIG stated in a letter that it planned to engage in a review of quarterly average manufacturer prices for the 200 top generic drugs from 2005 through 2014 in the Medicaid program.[34]

68.     According to a June 26, 2015 report by the service Policy and Regulatory Report ("PaRR"), "prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever. Like in that case, prosecutors expect 'to move from one drug to another in a similar cascading fashion.'"[35]

**E.     Defendants' SEC Filings Reveal Investigations Into Potential Antitrust Violations With Respect to Generic Drug Prices.**

69.     As previously stated in this Complaint, beginning in November of 2014, the DOJ issued grand jury subpoenas to Defendants Lannett, Impax, Par, Allergan, Actavis, and Mylan and, in some cases, their employees. These subpoenas have been acknowledged in SEC filings of all Defendants. Currently, it is not publically known if Defendant West-Ward also received a subpoena because its foreign parent, Hikma, does not make disclosures to the SEC.

---

[33] *See* February 24, 2015 letter at http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file. Last accessed on April 29, 2016.

[34] *See* April 12, 2015 letter at http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file. Last accessed on April 29, 2016.

[35] The United States Department of Justice has called this conspiracy the biggest criminal antitrust investigation that we've ever encountered with respect to the impact on U.S. businesses and consumers; it currently includes 36 automotive parts cases. *See* http://www.mergermarket.com/pdf/doJ-collusion-generic-drug-prices-2015.pdf. Last accessed April 26, 2016.

70.     Defendant Lannett: On February 6, 2015, in its SEC Form 10-Q, Defendant
Lannett submitted that on "November 3, 2014, the Senior Vice President of Sales and Marketing
of the Company[36] was served with a grand jury subpoena relating to a federal investigation of the
generic pharmaceutical industry into possible violations of the Sherman Act."[37] Additionally, on
December 5, 2014, the Company was served with a grand jury subpoena related to the federal
investigation of the generic pharmaceutical industry into possible violations of the Sherman Act.
The subpoena requests corporate documents from the Company relating to corporate, financial,
and employee information, communications or correspondence with competitors regarding the
sale of generic prescription medications, and the marketing, sale, or pricing of certain
products."[38]

71.     Defendant Lannett issued a new SEC Form 10-K on August 27, 2015, which
offered more details, including an indication that the DOJ has caused subpoenas to be issued to a
number of "certain affiliated individuals," and that the scope of the DOJ's investigation extends
back a decade. It states:

> "In fiscal year 2015, the Company and certain affiliated individuals each were
> served with a grand jury subpoena relating to a federal investigation of the generic
> pharmaceutical industry into possible violations of the Sherman Act. The
> subpoenas request corporate documents of the Company relating to corporate,
> financial, and employee information, communications or correspondence with
> competitors regarding the sale of generic prescription medications, and the
> marketing, sale, or pricing of certain products, generally for the period of 2005
> through the dates of the subpoenas."[39]

---

[36] This individual is believed to be Kevin Smith ("Mr. Smith"), according to Lannett's website at
http://www.lannett.com/about-lannett-management.php. Last accessed on May 3, 2016.

[37] *See* Defendant Lannett's February 6, 2015 SEC Form 10-Q at
http://www.sec.gov/Archives/edgar/data/57725/000110465915007227/a14-26533_110q.htm. Last accessed on April
29, 2016.

[38] *See* Defendant Lannett's February 6, 2015 SEC Form 10-Q at
http://www.sec.gov/Archives/edgar/data/57725/000110465915007227/a14-26533_110q.htm. Last accessed on April
29, 2016.

[39] *See* Lannett's Form 10-K for the fiscal year ending June 30, 2015 at page 18 at
http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm. Last accessed on April

72.     Defendant Par: Defendant Par issued a similar disclosure in their SEC Form 10-K dated March 12, 2015, stating that "[o]n December 5, 2014, we received a subpoena from the Antitrust Division of the DOJ requesting documents related to communications with competitors regarding our authorized generic version of Covis's Lanoxin® (digoxin) oral tablets."[40] This disclosure again appeared in Par's second quarter 2015 10-Qs. Likewise, in a Form 10-Q for the third quarter of 2015, Defendant Par's parent company (Endo International plc) stated that "[o]n December 5, 2014, the Company's subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products."[41]

73.     Defendant Impax: Similarly, Defendant Impax's 2014 Form 8-K also discloses the DOJ's subpoena regarding their production of generic doxycycline and generic digoxin. It states that "[o]n November 3, 2014, a sales representative of the Company received a subpoena from the Justice Department's Antitrust Division requesting the production of documents to and testimony before the grand jury of the Eastern District of Pennsylvania. The request relates to any communication or correspondence with any competitor (or an employee of any competitor)

---

29, 2016.

[40] *See* Defendant Par's March 12, 2015 SEC Form 10-K at
https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm. Last accessed on May 2, 2016.

[41] *See* Endo International plc's Form 10-Q for the period ending September 30, 2015 at
http://www.sec.gov/Archives/edgar/data/1593034/000159303415000034/endp-9302015x10q.htm. Last accessed on May 2, 2016.

in the sale of generic prescription medications."[42] Later, in a SEC Form 10-Q filed on May 11, 2015, Impax disclosed that "on March 13, 2015, the Company received a grand jury subpoena from the Justice Department requesting the production of information and documents regarding the sales, marketing, and pricing of certain generic prescription medications," including digoxin.[43] This assertion was repeated in Impax's Form 10-Q filed on August 10, 2015[44], and reconfirmed in its Form 10-K filed on February 22, 2016.[45]

74.     Defendant Allergan and Actavis: disclosed the same in their SEC Form 10-Q filed on August 6, 2015, stating that "[o]n June 25, 2015, the Company received a subpoena from the U.S. Department of Justice ('DOJ'), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[46] As one article stated, "[a]s the fourth largest distributor of pharmaceuticals in the U.S., Allergan is the largest company that has been targeted by the DOJ… Like the other generic manufacturers who have been subpoenaed – Impax Laboratories, Lannett Company, and Par Pharmaceutical Companies, Inc. – Actavis has manufactured digoxin. Actavis has also supplied doxycycline, which may be significant because Par had disclosed that its DOJ subpoena sought communications related to doxycycline."[47]

---

[42] *See* Defendant Impax's 2014 8-K at
http://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm. Last accessed on May 2, 2016.

[43] *See* Defendant Impax's Form 10-Q filed on May 11, 2015 for the period ending March 31, 2015 at
http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/88fbdd3c-25b3-4640-935d-4c2ced2a6a47.pdf?noexist=true
at page 46. Last accessed on May 2, 2016.

[44] *See* http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/0995ec20-ce96-4de1-98aa-
4aacfdb675e6.pdf?noexist=true at page 51. Last accessed on May 2, 2016.

[45] *See* Defendant Impx's Form 10-K filed on February 22, 2016 at http://d1lge852tjjqow.cloudfront.net/CIK-
0001003642/0d396bab-0306-4c61-90fe-b5cce6e02624.pdf?noexist=true at F-53. Last accessed on May 2, 2016.

[46] *See* Defendant Allergan's Form 10-Q filed on August 6, 2015 at
https://www.sec.gov/Archives/edgar/data/1578845/000156459015006357/agn-10q_20150630.htm at page 64. Last accessed on May 2, 2016.

[47] *See* the Antitrust Law Blog of Patterson Belknap Webb & Tyler LLP's article "The Government's Generic Price-

75.     Defendant Mylan: Defendant Mylan's parent company (Mylan N.V) also issued a similar disclosure on their SEC Form 8-K on December 4, 2014, stating that "[o]n December 3, 2015, a subsidiary of Mylan N.V. … received a subpoena from the Antitrust Division of the U.S. Department of Justice … seeking information relating to the marketing, pricing and sale of our generic Doxycycline products and any communications with competitors about such products."[48]

76.     Regulatory investigations against Defendant Mylan are not limited to generic doxycycline, however. In Mylan N.V.'s SEC Form 10-K filed on February 16, 2016, it reported that "[o]n December 21, 2015, the Company received a subpoena and interrogatories from the Connecticut Office of the Attorney General seeking information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[49]

77.     The fact that Defendants Lannett, Impax, Allergan, Actavis, Mylan, and Par and/or their employees have received federal grand jury subpoenas are strong indicators that antitrust offenses have occurred. Numerous legal commentators have also discussed the significance of the criminal subpoenas being issued to the Defendants. For example, the following observation was made with respect to the fact that both subpoenas for specific individuals along with Company-focused subpoenas were issued:

> The Justice Department's subpoenas focus on sharing and exchanging of pricing information and other issues among generic drug companies. The initial subpoenas, including two senior executives, suggest that the Justice Department

---

Fixing Investigation Targets Allergan's Actavis Unit by Stephanie Gyetvan on august 18, 2015 at http://www.antitrustupdateblog.com/blog/doj-generic-price-fixing-investigation-targets-allergans-actavis-unit/. Last accessed May 2, 2016.

[48] *See* Mylan N.V.'s Form 8-K filed on December 4, 2015 at https://www.sec.gov/Archives/edgar/data/1623613/000119312515394875/d225442d8k.htm. Last accessed on May 2, 2016.

[49] *See* Mylan N.V.'s Form 10-K filed on February 16, 2016 for the period ending December 31, 2015 at http://files.shareholder.com/downloads/ABEA-2LQZGT/146191293x0xS1623613-16-46/1623613/filing.pdf at page 160. Last accessed on May 2, 2016.

has specific information relating to their participation in potentially criminal conduct. It is rare for the Justice Department to open a criminal investigation with specific subpoenas for individuals, along with company-focused subpoenas.

Given the breadth of such a potential cartel investigation, the Justice Department's inquiry of the generic pharmaceutical industry could be significant. The prices for a large number of generic drug prices have increased significantly over the last year. There does not appear to be any rational explanation for such increases involving a diverse set of products.

**The scope of these price increases and the timing of them certainly raise serious concerns about collusive activity among competitors**.[50] (emphasis added).

78.     Mark Rosman, former assistant chief of the National Criminal Enforcement Section of the DOJ's Antitrust Division also noted the "unusual" nature of the criminal subpoenas: "The subpoenas signal a broad federal investigation into potential Sherman Act violations in the generic pharmaceutical industry – with potential criminal implications for the companies and individuals involved."[51]

79.     Indeed, he continues, "[a] DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[52]

80.     Defendant Lannett's CEO, Bedrosian, has even signaled the company's intention to increase prices and his expectation that his competitors would follow suit. With respect to Mr. Smith, one of the individuals seemingly subpoenaed by the DOJ, Bedrosian stated:

---

[50] *See* JDSupra's "Criminal Global Cartel Focus on Generic Pharmaceuticals" by Michael Volkov on November 26, 2014 at http://www.jdsupra.com/legalnews/criminal-global-cartel-focus-on-generic-92387/. Last accessed on May 2, 2016.

[51] *See* Law360's "DOJ's Investigation Into Generic Pharma Pricing Is Unusual" on November 12, 2014 at https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf. Last accessed on May 2, 2016.

[52] *See* Law360's "DOJ's Investigation Into Generic Pharma Pricing Is Unusual" on November 12, 2014 at https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf. Last accessed on May 2, 2016.

"We tend to be a price leader on price increases and the credit goes to my sales vice president. He takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company. And he's the first step in that process… And he's done a good job there… We believe that these prices are important. We need to try raising them… I am finding a climate out there has changed dramatically and I see more price increases coming from our competing -- competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors follow suit.[53]

81.     The above signal by Bedrosian was made at a September 10, 2013 discussing Q4 2013 results. In a later earnings call on November 7, 2014 discussing Q1 2014 earnings after the initial generic digoxin price increases, Bedrosian confirmed that Defendant Lannett's primary competitor had indeed obliged by Lannett's price increase signal: "[W]e've been successful in benefiting from the difficulties of our competitors who have left the market and as a result, our market share has continued to grow. We've had a recent price increase on the product as well because we are now only 1 of 2 people in the market. And as a result, I expect that product to do very well… this is a serious drug for these companies to reintroduce. So I believe that the FDA will be scrutinizing those companies very carefully. So I don't see any particular issues in that particular product going forward." (emphasis added). [54]

82.     After more price increases on generic digoxin, Defendant Par entered the generic digoxin market, but Bedrosian noted that he was not concerned about this new entry because "we see Par as one of our rational competitors in the marketplace… we're not troubled by their

---

[53] *See* Transcript of Lannett Management Q4 2013 Earnings Call at http://seekingalpha.com/article/1685792-lannett-management-discusses-q4-2013-results-earnings-call-transcript?page=5. Last accessed on May 3, 2016.

[54] *See* Transcript of Lannett Management's November 7, 2013 Q1 2014 Earnings Call at http://seekingalpha.com/article/1820502-lannett-management-discusses-q1-2014-results-earnings-call-transcript?part=single. Last accessed on May 3, 2016.

pricing in the marketplace. Not at all… [t]he prices that they're quoting are not doing us any harm at all." (emphasis added). [55]

83.    In a later earnings call on November 3, 2014, Bedrosian again expressed confidence that Lannett would not have to engage in price competition generally in the generic drug market because Lannett and its competitors were "less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell."[56]

84.    On the same call, according to Bedrosian, with respect to Defendants Par and Impax, "the companies we're looking at here are not irrational players, I don't see them just going out and trying to grab market share." Similarly, Bedrosian was confident that Mylan, expected to enter the market, is also "one of those rational competitors, so we're not really expecting anything crazy from them."[57] Therefore, for Defendant Lannett, "irrational competitors" are those who obtain market share through price competition – evidently unlike Defendants Par, Impax, and Mylan.

85.    Indeed, Bedrosian confidently concluded that "now we're more comfortable that we'll see strong sales for Digoxin throughout the rest of the year."[58]

86.    On February 4, 2015, in another quarterly earnings call, Bedrosian announced that there would be a moratorium on price competition in the generic marketplace, stating that "I

---

[55] See February 6, 2014 Transcript from Lannett Management Q2 2014 Earnings Call at http://seekingalpha.com/article/2002271-lannett-management-discusses-q2-2014-results-earnings-call-transcript?part=single. Last accessed on May 3, 2016.

[56] See November 3, 2014 Transcript from Lannett Management Q1 2015 Earnings Call at http://seekingalpha.com/article/2633575-lannetts-lci-ceo-arthur-bedrosian-on-q1-2015-results-earnings-call-transcript?part=single. Last accessed on May 3, 2016.

[57] See November 3, 2014 Transcript from Lannett Management Q1 2015 Earnings Call at http://seekingalpha.com/article/2633575-lannetts-lci-ceo-arthur-bedrosian-on-q1-2015-results-earnings-call-transcript?part=single. Last accessed on May 3, 2016.

[58] See November 3, 2014 Transcript from Lannett Management Q1 2015 Earnings Call at http://seekingalpha.com/article/2633575-lannetts-lci-ceo-arthur-bedrosian-on-q1-2015-results-earnings-call-transcript?part=single. Last accessed on May 3, 2016.

think you're going to find more capital pricing, more – I'll say less competition, in a sense. You won't have price wars."[59]

87.     Defendant Impax's CEO, Frederick Wilson, has also discussed how his Company observes price competition. In a Q3 2014 earnings call, he acknowledged that "[w]e really don't talk much about pricing publicly… we've done what most of the other generic competitors have done, we look at opportunities, we look at how competition shifts, we look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those…".[60] (emphasis added).

88.     This meeting of the minds between Defendants – direct competitors of generic doxycycline and generic digoxin – resulted in massive, ill-gained profits. Indeed, Bedrosian reported that with respect to their financial results, "we had a tremendous quarter…". "For fiscal 2015 second quarter, we recorded the highest net sales and net income in our company's history. Net sales were $115 million" and "[o]ur outlook for fiscal 2015 remains strong. And with the excellent performance in the second quarter, we have raised our full year guidance."[61]

89.     Martin Galvan, Defendant Lannett's Chief Financial Officer, confirmed the same exceptional financials the Company: "[W]e reported an outstanding fiscal 2015 second quarter, with net sales increasing 71% to $114.8 million, from $67.3 million in last year's second

---

[59] *See* February 4, 2015 Transcript from Lannett Management Q2 2015 Earnings Call at http://seekingalpha.com/article/2885806-lannetts-lci-ceo-arthur-bedrosian-on-q2-2015-results-earnings-call-transcript. Last accessed on May 3, 2016.

[60] *See* Transcript of Impax's Q3 2014 Earnings Call (November 4, 2014) at http://seekingalpha.com/article/2638955-impax-laboratories-ipxl-ceo-frederick-wilkinson-on-q3-2014-results-earnings-call-transcript?part=single. Last accessed on May 4, 2016.

[61] *See* February 4, 2015 Transcript from Lannett Management Q2 2015 Earnings Call at http://seekingalpha.com/article/2885806-lannetts-lci-ceo-arthur-bedrosian-on-q2-2015-results-earnings-call-transcript. Last accessed on May 3, 2016

quarter." Generic digoxin played a large role in Lannett's success; the medication is part of Lannett's top 3 categories of sales (cardiovascular sales).[62]

90.     Similarly, Defendant Impax also experienced a significant increase in revenue during the 2014 calendar year. According to its 2015 SEC Form 10-K filed on February 26, 2015, Impax received $596 million in total revenues up from $511 million in 2013, which amounts to a 17% increase. One of the primary reasons for this growth was due "to higher sales of our Digoxin."[63]

**F.     The Market For Generic Drugs Such As Doxycycline and Digoxin is Highly Conducive To Price Fixing And Collusion**

91.     The characteristics of the generic drug industry in the United States are conducive to price-fixing and have rendered collusion for generic doxycycline and generic digoxin plausible. Industry characteristics are critically important to determining the likelihood of collusion in that industry. Collusion is more probable in industries where: (1) high barriers to entry exist; (2) demand is inelastic; (3) the market is highly concentrated; (4) the products are homogenous; (5) there are ample opportunities to conspire; and (6) purchasers lack buying power. Each of these factors exist in the generic drug market, which has allowed Defendants to successfully – and unlawfully – manipulate the pricing for generic doxycycline and generic digoxin.

---

[62] *See* February 4, 2015 Transcript from Lannett Management Q2 2015 Earnings Call at http://seekingalpha.com/article/2885806-lannetts-lci-ceo-arthur-bedrosian-on-q2-2015-results-earnings-call-transcript. Last accessed on May 3, 2016

[63] *See* Defendant Impax's Form 10-K filed 2/26/15 for the period ending 12/31/14 at http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/c545ab21-aa3d-4426-a0b9-ba4373b6c213.pdf?noexit=true. Last accessed on May 4, 2016.

1.   **High Barriers to Entry: New Competitors Seeking to Enter the Generic Drug Industry Face High Barriers to Entry**

92.    The extreme difficulty for new entrants seeking to enter the generic drug industry facilitates the formation, maintenance, and successful continuation of a cartel because new entrants are less likely to enter or have the ability to break into the market.

93.    There are substantial barriers that preclude, reduce, or make more difficult entry into the generic drug market. For example, a potential new entrant faces costly and lengthy start-up costs, including significant capital required for research and development; high-tech production facilities manufacturing plants and equipment; distribution infrastructure; labor costs; regulatory oversight; intellectual property costs; and long-standing customer relationships with existing manufacturers. Each of these barriers have proven to be key hurdles for prospective players seeking to foray into the generic drug market. Indeed, Defendant Par explicitly notes on their own homepage that they "offer[] a line of high-barrier-to-entry generic drugs."[64] Par's 2015 Form 10-K states the same: "Our goal is to strengthen our position as a leading pharmaceutical company by developing and commercializing generic drugs with limited competition, high barriers to entry and longer life cycles"[65] (emphasis added).

94.    Additionally, generic drugs are expensive to manufacture in multiple respects. For example, the cost to create suitable manufacturing facilities to manufacture generic drugs are very high and thereby prohibitive to new entrants attempting to enter into the market. Having the capability and resources to build and maintain these large-scale production manufacturing facilities are rare.

---

[64] *See*
http://www.parpharm.com/index.php?option=com_content&view=article&id=78&Itemid=18?ref=binfind.com/web. Last accessed April 22, 2016.

[65] *See* Defendant Par Pharmaceutical Companies, Inc.'s Form 10-K Annual Report to the United States Securities and Exchange Commission at https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm. Last accessed April 26, 2016.

95.     Even remediation of production facilities are highly prohibitive. For example, Defendant West-Ward's temporary shut-down of its New Jersey production facility for digoxin cost $39 million in remediation.[66]

96.     Defendant Impax, for example, boasts their Hayward facilities include a "35,125-square-foot research and development facility, a 50,400-square-foot commercial manufacturing facility, a 14,400 square-foot administration building, and a 65,000 square foot warehouse."[67]

97.     Similarly, Defendant Lannett also touts that their "manufacturing facility consists of 31,000 square feet on an approximately 3.5-acre parcel of land that we own. We also own a 63,000 square foot building on approximately 3.0 acres locate within one mile of our manufacturing facility that houses packaging, R&D and certain administrative functions. In addition, we recently purchased a third building located several miles from our manufacturing facility, consisting of 66,000 square feet on approximately 7.3 acres. This building will be used as our main distribution facility as well as housing key administrative functional areas supporting the organization."[68]

---

[66] See Defendant West-Ward's webpage at http://www.west-ward.com/en/NewsEvents/2015%2007%2028%20Hikma%20Acquires%20Roxane: "The results for the year ended 31 December 2014 were significantly impacted by a number of items that are not expected to recur, as well as ongoing costs in respect of Roxane's investment in certain key products in its development pipeline which in 2014 amounted to $39 million." Last accessed April 26, 2016.

[67] See http://www.impaxlabs.com/careers/directions. Last accessed April 22, 2016.

[68] See http://www.lannett.com/about-lannett-generic-drug-company.php. Last accessed April 22, 2016. Lannett CEO Arthur Bedrosian also discussed manufacturing expansions and required compliance with the FDA, all of which are difficult for a small company to undertake: "Well, if you consider that we have 3 facilities in Philadelphia and that's roughly 160,000 square feet under 3 roofs, this building, this fourth building, is 196,000 by itself… We'll certainly put in the infrastructure initially and then we'll add suites and rooms as we grow. And we've already designed and brought in some firms to help us with the design. We'll be meeting with the FDA with regards to the layout of the facility as we've done in the past." See Transcript of Lannett Management Q4 2013 Earnings Call at http://seekingalpha.com/article/1685792-lannett-management-discusses-q4-2013-results-earnings-call-transcript?page=5. Last accessed on May 3, 2016.

98.     As these statements show, the nature of entering the business of manufacturing generic drugs is highly cost-prohibitive; this barrier to entry increases the possibility and success of collusive activity, making new entrants into the market few and are between.

### 2.     Inelastic Demand: The Highly Inelastic Demand for Generic Drugs Facilitates Collusion

99.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  Demand is said to be "elastic" where the quantity demanded changes with the price of the product. Conversely, demand is said to be "inelastic" if an increase in the price of a product results in a negligible – if any – decline in the quantity sold of that product. In other words, the same quantities are still purchased despite the rise in price.

100.     Demand must be relatively inelastic at competitive prices in order for a cartel to profit from raising prices above competitive levels. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers will purchase substitute products or decline to purchase the product altogether. Therefore, inelastic demand is a market characteristic that facilitates collusion because it allows manufacturers to increase their prices without triggering customer substitution and lost sales revenue.

101.     Demand for generic doxycycline and generic digoxin is highly inelastic because of the critical nature of the drug – both are accessible, medical necessities that must be purchased at whatever cost the Defendants choose to offer the drug for sale. As previously mentioned, generic doxycycline is a decades-old, common antibiotic that treats a host of various bacterial infections such as acne, urinary tract infections, intestinal infections, eye infections, sexually transmitted diseases, malaria, and anthrax.[69] Also previously mentioned, generic digoxin is critical to patients suffering from cardiovascular disease – about 610,000 people die of heart

---

[69] *See* http://www.drugs.com/doxycycline.html for an overview of doxycycline. Last accessed on April 26, 2016.

disease in the United States every year, which amounts to 1 in every 4 deaths.[70] As critical medical necessities, the generic doxycycline and generic digoxin markets are prime candidates for cartelization because price increases will result in more revenue instead of less. Indeed, digoxin is listed on the World Health Organization's ("WHO") list of essential medicines.[71] The same is true for doxycycline.[72]

102.    Furthermore, other pharmaceutical companies cannot quickly develop, manufacture, and produce alternate forms of these two generic drugs in order to bypass the need for these two generic drugs. Medication is an immediate need, and without an alternative, consumers must, will, and did purchase the drug products at supracompetitive prices.

>   **3.    Industry Concentration: The Highly Concentrated Aspect of the Generic Doxycycline and Generic Digoxin Industries Increases Its Susceptibility to Collusion and Other Anti-Competitive Practices**

103.    Market concentration facilitates collusion because collusive agreements are easier to implement and maintain when there are relatively few firms controlling a large portion of the market. Practical issues such as coordinating cartel meetings and exchanging information are much simpler to sustain and carry out when there are only a small number of players involved. If the participants can coordinate pricing decisions, they can effectively control the total industry output, resulting in elevated prices across the industry.

104.    Additionally, each participants' high degree of control also simplifies any coordination issues because there exists little outside competitive presence or pressure to undermine the cartel. When there are fewer firms in the market, the transitory bump in profits

---

[70] *See* the Centers for Disease Control and Prevention's ("CDC") Heart Disease webpage at http://www.cdc.gov/heartdisease/facts.htm. Last accessed on April 26, 2016.

[71] *See* WHO's April 2015 Model List of Essential Medicines at http://www.who.int/medicines/publications/essentialmedicines/EML2015_8-May-15.pdf. Last accessed on April 26, 2016.

[72] *Id.*

that could be achieved by undercutting the cartel price and gaining a temporary increase in market share is outweighed by the greater, more enticing long-term increased market share for a colluding firm in a concentrated industry.

105.    By contrast, if an industry is divided into many small firms, the immediate gain from cheating on a cartel (profits from sales captured from other cartel members through undercutting of the cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future) is substantial relative to the firm's possible gains from the cartel's continuing future success (the firm's future share of the total cartel profits if collusion were to continue successfully; divided amongst many firms, the "cheating" firm's share is comparatively lower).

106.    During the Class Period, Defendants collectively controlled the lion's share of the market for generic doxycycline and/or generic digoxin, both globally and in the United States. Since the generic doxycycline and generic digoxin markets are dominated by only a few companies who control the vast majority of these markets, the continuing agreements, understandings, or conspiracies to fix, raise, maintain and/or stabilize prices and to allocate market shares for those generic drugs are effective at setting the prices of the medicine at artificially high, supra-competitive prices.

107.    For example, the below graphic[73] by a corporation focused in part on empowering consumers shows that when the number of competitors for digoxin made even a small dip in the number of competitors in the market from 8 down to 5, the price for generic digoxin dramatically rose. The reduced competition between 2003 and 2013 caused a 637% price impact between those years.

---

[73] *See* Optum's website at https://www.optum.com/thought-leadership/whatcanbedone.html.html. Last accessed on April 26, 2016.



Image 16: Chart demonstrating the significant price impact that occurs when competition is reduced in the digoxin market. Source: https://www.optum.com/thought-leadership/whatcanbedone.html.html.

108.    Furthermore, because most players in the generic doxycycline and generic digoxin markets operate on wafer-thin profit margins, market consolidation is occurring as larger players acquire smaller players. As previously mentioned, this market concentration contributes to the possibility of price-fixed generic doxycycline and generic digoxin markets because a concentrated market is more susceptible to collusion and other anticompetitive practices.

### 4.    Homogeneity: Generic Doxycycline and Generic Digoxin Are Homogenous and Commoditized Products, Two Characteristics That Are Highly Conducive for Collusion

109.    Homogenous products enhance and facilitate collusion more than product differentiation because they enable manufacturers to more easily negotiate an agreement on prices or quantities. By the same token, homogeneity also facilitates monitoring.

110.    Generic doxycycline and generic digoxin are homogenous products or commodities because their characteristics and qualities are completely uniform across different manufacturers. By virtue of being a generic drug, the medicine must be therapeutically equivalent to the brand-named medicine, and each and every generic doxycycline is biologically

46

identical to the next; every generic digoxin is biologically identical to the next. Indeed, manufacturers cannot achieve any product differentiation whatsoever with respect to generic doxycycline and generic digoxin. Therefore, generic doxycycline and generic digoxin are highly commoditized products because generic doxycycline and generic digoxin from one Defendant manufacturer can easily be substituted for generic doxycycline and generic digoxin from another Defendant manufacturer. This ease of substitution exists because drug products are considered pharmaceutical equivalents only if they contain the same active ingredient(s), are of the same dosage form, route of administration and are identical in strength or concentration.[74] Indeed, pharmaceutically equivalent drug products are formulated to contain the same amount of active ingredient in the same dosage form and to meet the same standards (i.e., strength, quality, purity, and identity).[75]

111.    Generic doxycycline and generic digoxin are also commodities. In economics, a commodity is a basic item or goods used in commerce that is interchangeable with other commodities of the same type. Some traditional commodities are sugar, wheat, and rubber. Markets for commodity products are particularly conducive to collusion because generally, when a product is considered a commodity, competition is principally based on price rather than other features such as product quality or customer service. Such price-centered markets facilitate coordination because manufacturers or distributors wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement because differences in prices are more likely to reflect cheating on the conspiracy than any other factor which might affect pricing, such as special product characteristics, service, or other aspects of the transaction.

---

[74] *See* http://www.fda.gov/ohrms/dockets/ac/05/briefing/2005-4137B1_07_Nomenclature.pdf, as excerpted from the Orange Book. Last accessed April 22, 2016.

[75] *See* http://www.fda.gov/ohrms/dockets/ac/05/briefing/2005-4137B1_07_Nomenclature.pdf, as excerpted from the Orange Book. Last accessed April 22, 2016.

112.    It is established that generic doxycycline and generic digoxin are commodities and that the world market for the two generics are subject to intense pricing pressures. With little focus on quality differences because the very nature of generic medicines are that they must be consistently biologically equivalent, pricing for generic doxycycline and generic digoxin is the decisive factor influencing consumer purchase decisions, making the product particularly susceptible to collusive activity.

     **5.      Opportunity to Conspire: Defendants Have Ample Opportunities to Conspire to Fix Prices of Generic Drugs Such As Doxycycline and Digoxin Through Their Participation in Trade Associations**

113.    Defendants' participation in trade associations helped facilitate their collusion because trade associations provided opportunities for Defendants to meet frequently and exchange information. Their overlapping membership in various trade associations also provided incentive for cartel members to stay within the illegally agreed upon price framework because they could monitor one another's activities in the generic doxycycline and generic digoxin markets and punish any non-compliance.

114.    Trade associations and other common forums also facilitated Defendants' collusion by acting as a cover for meetings and communications regarding the pricing of generic doxycycline and generic digoxin. Providing a guise for "proper" agendas, these associations and common forums shielded Defendants' conspiracy to fix, raise, maintain and/or stabilize prices, and to allocate market shares for generic doxycycline and generic digoxin.

115.    Defendants are members or participants in the Generic Pharmaceutical Association ("GPhA"), which describes itself on its website as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic

industry."[76] As members or participants, the Defendants have opportunities to meet and conspire at functions held by the group, as well as at industry healthcare meetings.

116. GPhA was founded in 2000 after the merger of three generics trade organizations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance. The three trade associations represented similar members, with the former two focusing on scientific issues and the latter on sales and marketing issues. Banded together as GPhA, the industry now speaks with an even stronger, more unified voice before federal and state lawmakers, regulatory policymakers, and international agencies.

117. Several Defendants also have representatives on the GPhA 2016 Board of Directors, including Defendants Impax, Mylan, and Par. Other Defendants are members of the organization. By virtue of their membership in such organizations, Defendants have the opportunity to meet, to have improper discussions under the guise of legitimate business contacts, and to perform acts or non-acts necessary to operate and further the conspiracy. In GPhA's 2015 Annual Report, it notes that "GPhA member companies supply nearly 90 percent of the generic prescription drugs dispensed in the U.S. each year."[77] The "membership includes the world's largest generic finished dose manufacturers and active pharmaceutical ingredient suppliers"[78] and by becoming a part of GPhA, Defendants "can take an active role in helping shape the laws, regulations, and policies that govern the generic pharmaceutical industry and help secure the future of this vital pharmaceutical market segment."[79]

---

[76] *See* the GPhA's website at: http://www.gphaonline.org/about/the-gpha-association. Last accessed April 26, 2016.

[77] *See* the GPhA's 2015 Annual Report at page 20 at
http://www.gphaonline.org/media/wysiwyg/GPhA2015AnnualReport.pdf. Last accessed April 26, 2016.

[78] *Id.*

[79] *Id.*

6. **Lack of Buying Power: With No Comparable Substitutes Available, Indirect Purchasers of Generic Doxycycline and Generic Digoxin Are Forced To Purchase from Defendants In Order To Obtain the Medication**

118.    Standard economics maintains that when many buyers exist in a market for a particular good – as is the case in the generic doxycycline and generic digoxin markets – that good is more susceptible to cartel behavior. As previously discussed, this is because the incentive for cartel members to undercut the conspiracy is much lower when there are many smaller purchasers – while each potential sale is small, disrupting the cartel could carry large losses or "penalties." A cartel member, thus, is incentivized to avoid the collapse of the entire price-setting agreement and the loss of the supracompetitive profits on all sales in that market when there are many buyers. Conversely, a cartel's ability to raise prices can more easily be thwarted in markets where there are less buyers because they hold more significant negotiating power with sellers.

119.    As set forth above, both direct and indirect purchasers in the generic doxycycline and generic digoxin markets lacked buying power. Since there are many purchasers of generic doxycycline and generic digoxin, it is easier to form and maintain a cartel because a large number of buyers makes it less likely that Defendant manufacturers will cheat on the group agreement to artificially inflate prices. The loss of supra-competitive profits on their sales of generic doxycycline and generic digoxin outweigh the potential additional profits of raising sales to a handful of modestly-sized customers.

120.    Moreover, there are no close functional substitutes for generic doxycycline and generic digoxin. The only other therapeutic equivalent of these generic medicines are the brand-name version of the drug – which are, as described supra, sold at a significantly higher (prohibitively higher) price point. Given the frequently-prescribed nature of doxycycline and

digoxin and the numerous, common types of diseases and illnesses that they treat, the demand for the two drugs will at the very least remain the same, if not continue to rise.

121.    To add insult to injury, on top of Plaintiff and the Class' lack of buying power, Defendants also had a common motive to conspire to fix generic doxycycline and generic digoxin prices. Since generic doxycycline and generic digoxin are both commodities, price is the clearest differentiation amongst generics for purchasers. In a market of this nature, with trillions of generics being manufactured and sold a year at very inexpensive individual prices, there is a huge incentive to fix, stabilize, maintain and raise the prices of the generics to supracompetitive levels through illegal conspiratorial agreements. By foregoing competition in such a high volume market, each manufacturer essentially guarantees themselves enormous, ill-gained profits.

122.    Participating in this anticompetitive conspiracy, as Defendants have, has caused and continues to cause substantial harm to consumers, to competition, and to United States commerce altogether.

## VI.    DEFENDANTS' ANTITRUST VIOLATIONS CAUSED INJURY OF THE TYPE THAT ANTITRUST LAWS ARE MEANT TO PUNISH AND PREVENT

123.    As alleged in this Complaint, Defendants engaged in a conspiracy to fix, raise, stabilize, and maintain the price of generic doxycycline and/or generic digoxin in the United States and its territories throughout the class period ("Class Period"). The Class Period is defined as October 1, 2012 to the present.

124.    In formulating and effectuating the contract, combination, or conspiracy, Defendants  and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic doxycycline and generic digoxin sold in the United States and its territories. These activities included but are not limited to the following:

51

(a) Defendants participated in meetings and/or conversations to discuss the price of generic doxycycline and/or generic digoxin in the United States;

(b) Defendants agreed during those meetings and/or conversations to charge prices as specified levels and otherwise to increase and/or maintain prices of generic digoxin and/or generic doxycycline sold in the United States;

(c) Defendants agreed during those meetings and conversations to fix the prices of generic doxycycline and/or generic digoxin; and

(d) Defendants issued price announcements and price quotations in accordance with their agreements amongst each other.

125.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

126.    During the respective Class Periods, Plaintiff and the Classes paid supra-competitive prices for generic doxycycline and/or generic digoxin.

127.    Defendants' unlawful contract, combination, or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. Section 1) and Section 3 of the Sherman Action (15 U.S.C. Section 3) and the laws of various states.

128.    As a result of Defendants' unlawful conduct, Plaintiff and the other Class Members have been injured in their business and property in that they have paid more for generic doxycycline and/or generic digoxin than they would have paid in a competitive market. Defendants' price-fixing conspiracy had the following effects, among others:

(a) Price competition has been restrained or eliminated with respect to generic doxycycline and/or generic digoxin;

(b) The prices of generic doxycycline and/or generic digoxin have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c) Indirect purchasers of generic doxycycline and/or generic digoxin have been deprived of free and open competition; and

(d) Indirect purchasers of generic doxycycline and/or generic digoxin, including Plaintiffs, paid artificially inflated prices.

129.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their businesses or property, having paid higher prices for generic doxycycline and/or generic digoxin than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.    CLASS ACTION ALLEGATIONS

130.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2), seeking equitable and injunctive relief on the following classes ("Nationwide Injunctive Class"):

> All persons and entities in the United States and its territories who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products from October 1, 2012 through the present ("Class Period"). This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased defendants' generic doxycycline and/or generic digoxin products for purposes of resale or directly from defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of defendants' generic doxycycline and/or generic digoxin products were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

130.    Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure  seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states listed below ("Indirect Purchaser States"[80]) on behalf of the following class ("Damages Class"):

> All persons and entities in the Indirect Purchaser States who purchased, paid, and/or provided reimbursement for some or all of the purchase price of Defendants' generic doxycycline and/or generic digoxin products from October 1, 2012 through the present ("Class Period"). This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all federal and state governmental entities except for cities, towns or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased defendants' generic doxycycline and/or generic digoxin products for purposes of resale or directly from defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of defendants' generic doxycycline and/or generic digoxin products were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

131.    The Nationwide Injunctive Class and the Damages Classes are collectively referred as the "Classes" unless otherwise indicated.

132.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiff reasonably believes that there are millions of members in each Class.

133.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all of the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

---

[80] The Indirect Purchaser States consist of Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

(1) Whether Defendants engaged in a combination and conspiracies among themselves to fix, raise, maintain, and/or stabilize the prices of generic doxycycline and/or generic digoxin and/or engaged in market allocation for generic doxycycline and/or generic digoxin sold in the United States;

(2) The identity of the participants of the alleged conspiracies;

(3) The duration of the alleged conspiracies and the acts carried out by Defendants in furtherance of the conspiracies;

(4) Whether the alleged conspiracies violated the Sherman Act;

(5) Whether the alleged conspiracies violated state antitrust and restraint of trade laws, and/or state consumer protection laws;

(6) Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants;

(7) Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and members of the Classes;

(8) The effect of the alleged conspiracy on the prices of generic doxycycline and/or generic digoxin sold in the United States during the respective Class Periods;

(9) The appropriate injunctive and related equitable relief for the Nationwide Class; and

(10) The appropriate class-wide measure of damages for the Damages Class.

Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful

conduct in that they paid artificially inflated prices for generic doxycycline and/or generic digoxin purchased indirectly from Defendants and/or their co-conspirators.

134.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust, unfair competition, and class action litigation.

135.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

136.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

137.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

138.     Plaintiff brings the Damages Class on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more generic doxycycline and/or generic digoxin that a Defendant or co-conspirator manufactured during the respective Class Periods.

## VIII.   VIOLATIONS ALLEGED

### FIRST CLAIM FOR RELIEF
### (Violations of Sherman Act, 15 U.S.C. §§ 1 and 3)
### (On Behalf of Plaintiff and the Nationwide Class Against All Defendants)

139.     Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

140.     During the Class Period, Defendants and their coconspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section One and Three of the Sherman Act (15 U.S.C. §§ 1 and 3) by artificially reducing or eliminating competition in the United States.

141.     In particular, Defendants have combined and conspired to raise, fix, maintain, or stabilize the prices of generic doxycycline and/or generic digoxin.

142.     As a result of Defendants' unlawful conduct, prices for generic doxycycline and/or generic digoxin were raised, fixed, maintained, and stabilized in the United States.

143.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

144.     For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

(1) Participating in meetings and conversations to discuss the prices and supply of generic doxycycline and/or generic digoxin;

(2) Communicating in writing and orally to fix prices of generic doxycycline and/or generic digoxin;

(3) Agreeing to manipulate prices and supply of generic doxycycline and/or generic digoxin sold in the United States in a manner that deprived purchasers of free and open competition;

(4) Issuing price announcements and price quotations in accordance with the agreements reached;

(5) Selling generic doxycycline and/or generic digoxin to customers in the United States at non-competitive prices; and

(6) Providing false statements to the public to explain increased prices for generic doxycycline and/or generic digoxin.

145.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their businesses and property in that they have paid more for generic doxycycline and/or generic digoxin than they otherwise would have paid in the absence of Defendants' unlawful conduct.

146.    The alleged contract, combination or conspiracy is a per se violation of the federal antitrust laws.

147.    These violations are continuing and will continue unless enjoined by this Court.

148.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Classes seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**(Violation of State Antitrust Statutes)**
**(On Behalf of Plaintiff and the Damages Class Against All Defendants)**

149.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein. Plaintiff, on behalf of a nationwide class of Indirect Purchasers, alleges as follows.

150.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic doxycycline and generic digoxin in unreasonable restraint of trade and commerce, and in violation of the various state antitrust and other statutes set forth below.

151.    The contract, combination, or conspiracy consisted of a continuing agreement, understanding, and concerted action among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for generic doxycycline and generic digoxin and to allocate customers for generic doxycycline and generic digoxin in the United States.

152.    For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

> (1) Participating in meetings and conversations to discuss the prices and supply of generic doxycycline and generic digoxin;
>
> (2) Communicating in writing and orally to fix prices of generic doxycycline and generic digoxin;
>
> (3) Agreeing to manipulate prices and supply of generic doxycycline and generic digoxin sold in the United States in a manner that deprived purchasers of free and open competition;
>
> (4) Issuing price announcements and price quotations in accordance with the agreements reached;
>
> (5) Selling generic doxycycline and generic digoxin to customers in the United States at non-competitive prices; and
>
> (6) Providing false statements to the public to explain increased prices for generic doxycycline and generic digoxin.

153.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic doxycycline and generic digoxin.

154.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

155.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, et seq. Defendants' combinations or conspiracies had the following effects:   (1) price competition for generic doxycycline and generic digoxin was restrained, suppressed, and eliminated throughout Arizona; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, et seq.   Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, et seq.

156.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code §§ 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and

Professions Code Section §16720.  Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of generic doxycycline and generic digoxin at supracompetitive levels. The aforesaid violations of Section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic doxycycline and generic digoxin. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic doxycycline and generic digoxin. The combination and conspiracy alleged herein has had, inter alia, the following effects:  (1) price competition for generic doxycycline and generic digoxin has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic doxycycline and generic digoxin provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased generic doxycycline and generic digoxin directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for generic doxycycline and generic digoxin than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

157.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated §§ 28-4501, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic doxycycline and generic digoxin that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic doxycycline and generic digoxin in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, et seq.  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, et seq.

158.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-1, et seq. Defendants' unlawful conduct had the following effects: (1) generic doxycycline and generic digoxin price competition was

restrained, suppressed, and eliminated throughout Hawaii; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, et seq.   Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, et seq.

159.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.) Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the

Damages Class have been injured in their business and property and are threatened with further injury.

160.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, et seq. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553, et seq.

161.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Kansas; (2 generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid

supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, et seq.  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, et seq.

162.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, et seq.) Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin competition was restrained, suppressed, and eliminated throughout Maine; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, et seq.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, et seq.

163.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, et seq. Defendants' combinations

or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, et seq.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, et seq.

164.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes §§ 325D.49, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, et seq.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, et seq.

165.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, et seq. Defendants' combinations or conspiracies had the following effects:   (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, et seq. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, et seq.

166.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, et seq. Defendants' combinations or conspiracies had the following effects:   (1) generic doxycycline and generic digoxin price

competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, et seq.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

167.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further

injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, et seq.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, et seq.

168.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, et seq. Defendants' combinations or conspiracies had the following effects:   (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, et seq. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, et seq.

169.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, et seq. Defendants' combinations or conspiracies had the following effects:   (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at

artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, et seq. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, et seq.

170.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws §§ 340, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout New York; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin that were higher than they would have been absent the Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the

New York Donnelly Act, §§ 340, et seq.  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, et seq.

171.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, et seq. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

172.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at

artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, et seq. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, et seq.

173.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade

72

in violation of Oregon Revised Statutes §§ 646.705, et seq.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, et seq.

174.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, et seq. Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, et seq.

175.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and members of the Damages Class

were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, et seq. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, et seq.

176. Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, et seq. Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, et seq. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, et seq.

177.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, et seq.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, et seq.

178.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic doxycycline and generic digoxin were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin.  During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and

proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, et seq.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, et seq.

179.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, et seq. Defendants' combinations or conspiracies had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, et seq.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, et seq.

180.    Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiff and members of the Damages Class have paid more for generic doxycycline and generic digoxin than they otherwise would have paid in the absence of

Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

181.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of members of the Plaintiff and the members of the Damages Class.

182.    Accordingly, Plaintiff and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
**(Violations of State Consumer Protection Statutes)**
**(On Behalf of Plaintiff and the Damages Class Against All Defendants)**

183.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

184.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

185.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic doxycycline and generic digoxin were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and

"deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

186.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq.  During the Class Period, Defendants manufactured, marketed, sold, or distributed generic doxycycline and generic digoxin in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, et seq. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair

Competition Law. The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, et seq., including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, et seq. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, et seq. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of  generic doxycycline and generic digoxin in the State of California within the meaning of Section 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic doxycycline and generic digoxin.  Plaintiff and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as

alleged in this Complaint violates Section 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

187.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic doxycycline and generic digoxin were sold, distributed or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.  Plaintiff was not aware of Defendants' price-fixing conspiracy and has therefore unaware that he was being unfairly and illegally overcharged.   There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generic doxycycline and generic digoxin.  Defendants had the sole power to set that price and Plaintiff had no power to negotiate a lower price.  Moreover, Plaintiff lacked any meaningful choice in purchasing generic doxycycline and generic digoxin because he was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff could avoid the overcharges. Defendants' conduct with regard to sales of generic doxycycline and generic digoxin, including their illegal conspiracy to secretly fix the price of generic doxycycline and generic digoxin at supracompetitive levels and overcharge consumers,

was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public.  Defendants took grossly unfair advantage of Plaintiff. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic doxycycline and generic digoxin. Defendants' unlawful conduct had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and the Damages Class were deprived of free and open competition; and (4) Plaintiff and the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. As a direct and proximate result of the Defendants' conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

188.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq. Defendants' unlawful conduct had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and

members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

189.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, et seq. Defendants' unlawful conduct had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

190.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch

93A, § 1, et seq.  Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic doxycycline and generic digoxin were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11.  Defendants' unlawful conduct had the following effects: (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiff and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute, including multiple damages.

191.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Plaintiff and members of the Damages Class purchased generic digoxin and generic doxycycline for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of Generic digoxin and generic doxycycline in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic doxycycline and generic digoxin were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic doxycycline and generic digoxin. They concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of generic digoxin and generic doxycycline they purchased.  Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic doxycycline and generic digoxin by making public statements that were not in accord with the facts.  Defendants' statements and conduct concerning the price of generic digoxin and generic doxycycline were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing generic doxycycline and generic digoxin at prices established by a free and fair market. Defendants' unlawful conduct had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Missouri; (2)

generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.  As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, et seq., 15 CSR 60-8.010, et seq., and 15 CSR 60-9.010, et seq., and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

192.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, et seq., and §§ 30-14-201, et. seq. Defendants' unlawful conduct had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class

paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants marketed, sold, or distributed generic doxycycline and generic digoxin in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, et seq., and §§ 30-14-201, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

193.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic doxycycline and generic digoxin were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and the members of the Damages Class and the prices paid by them for generic doxycycline and generic digoxin as set forth in N.M.S.A., § 57-12-2E.  Plaintiff were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants generic doxycycline and generic digoxin.  Defendants had the sole power to set that price and Plaintiff had no power to negotiate a lower price.  Moreover, Plaintiff lacked any

meaningful choice in purchasing generic digoxin and generic doxycycline because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff could avoid the overcharges.  Defendants' conduct with regard to sales of generic doxycycline and generic digoxin, including their illegal conspiracy to secretly fix the price of generic digoxin and generic doxycycline at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public.  Defendants took grossly unfair advantage of Plaintiff. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic doxycycline and generic digoxin. Defendants' unlawful conduct had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, et seq., and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

194.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq. Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic doxycycline and generic digoxin were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic doxycycline and generic digoxin that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic doxycycline and generic digoxin; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic digoxin and generic doxycycline were misled to believe that they were paying a fair price for generic doxycycline and generic digoxin or the price increases for generic digoxin and generic doxycycline were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic doxycycline and generic digoxin would have an impact on New York consumers and not just the Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic doxycycline and generic digoxin would have a broad impact, causing consumer class members who indirectly purchased generic doxycycline and generic digoxin to be injured by paying more for generic doxycycline and generic digoxin than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of the Defendants described herein constitutes consumer-oriented

deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects:   (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout New York; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants marketed, sold, or distributed generic digoxin and generic doxycycline in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic doxycycline and generic digoxin in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

195.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq. Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic doxycycline and generic digoxin were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by

Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases.  Defendants' public statements concerning the price of generic doxycycline and generic digoxin created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy.  Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.  Defendants' unlawful conduct had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants marketed, sold, or distributed generic digoxin and generic doxycycline in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed

generic doxycycline and generic digoxin in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

196.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, et seq.) Members of this Damages Class purchased Generic digoxin and generic doxycycline for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic doxycycline and generic digoxin were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic doxycycline and generic digoxin. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic digoxin and generic doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects:  (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3)

Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic doxycycline and generic digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic doxycycline and generic digoxin at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of generic doxycycline and generic digoxin they purchased.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

197.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, et seq.) Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4)

Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, et seq., and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

198.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic doxycycline and generic digoxin were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic doxycycline and generic digoxin e.   Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic digoxin and generic doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects:   (1) generic doxycycline and generic digoxin price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic doxycycline and generic digoxin prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic doxycycline and generic digoxin. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic doxycycline and generic digoxin, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic doxycycline and generic digoxin at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

### FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)
### (On Behalf of Plaintiff and the Damages Class Against All Defendants)

199.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

200.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic doxycycline and generic digoxin.

201.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Damages Class for generic doxycycline and generic digoxin manufactured by Defendants during the Class Period.

202.    Plaintiff and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Damages Class may make claims on a pro rata basis.

## IX.    REQUEST FOR RELIEF

WHEREFORE, Indirect Purchaser Plaintiffs respectfully request that:

1.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

2.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

(a) An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b) A per se violation of Section 1 of the Sherman Act;

(c) An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the California's antitrust, unfair competition, and consumer protection laws as set forth herein; and

(d) Acts of unjust enrichment by Defendants as set forth herein.

3.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.     Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants wrongfully obtained as a result of their unlawful acts of unfair competition and acts of unjust enrichment.

7.     Plaintiff and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint.

8.     Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law.

9.     Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Dated: June 8, 2016                                      Respectfully Submitted,

Gary I. Smith
**HAUSFELD LLP.**
325 Chestnut St., Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271
Email: gsmith@hausfeld.com

Joseph W. Cotchett (*pro hac vice* pending)
Steven N. Williams (*pro hac vice* pending)
Adam J. Zapala (*pro hac vice* pending)
Joyce Chang (*pro hac vice* pending)
**COTCHETT, PITRE & McCARTHY,
LLP.**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
Facsimile: 650-697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
jchang@cpmlegal.com

Steven L. Stemerman (*pro hac vice*
pending)
Sarah Grossman-Swenson (*pro hac vice*
pending)
**DAVIS, COWELL & BOWE, LLP.**
595 Market Street, Suite 800
San Francisco, CA 94015
Telephone: 415-597-7200
Facsimile: 415-597-7201
stem@dcbsf.com
sgs@dcbsf.com

97